**Tagged Opinion**



**ORDERED in the Southern District of Florida on November 06, 2009.**

_____

**Robert A. Mark, Judge**
**United States Bankruptcy Court**

_____

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

| | |
|---|---|
| In re: | Case No. 06-11026 (SMB) |
| | Bankr. S.D.N.Y. |
| BANCREDIT CAYMAN LIMITED | Chapter 15 |
| (In Official Liquidation), | |
| | |
|     Debtor. | |
| | |
| BANCREDIT CAYMAN LIMITED | |
| (In Official Liquidation), acting by and | |
| through Richard E.L. Fogerty and James G. | |
| Cleaver, as Joint Official Liquidators, | |
| | |
|     Plaintiff, | |
| | |
| vs. | Adv. No. 07-1882-BKC-RAM-A |
| | |
| REGIONS BANK CORPORATION | |
| f/k/a UNION PLANTERS BANK, | |
| | |
|     Defendant. | |

### MEMORANDUM OPINION AND ORDER
### GRANTING DEFENDANT REGIONS BANK'S MOTION FOR
### <u>SUMMARY JUDGMENT ON ALL COUNTS OF THE AMENDED COMPLAINT</u>

This adversary proceeding arises from the Defendant bank's alleged unauthorized transfer of funds from the Plaintiff's accounts to the accounts of an affiliate. The Amended Complaint includes 11 counts: 2 statutory claims and 9 common law claims.  Defendant has filed a motion for summary judgment on all counts.  Plaintiff has since voluntarily dismissed common law counts III, IV, V, VI, VII, VIII in part, and IX of the Amended Complaint.  Only Counts I and II for breach of contract, Count VIII for accounting, Count X for turnover and Count XI for violation of Florida Statute § 670.203 remain.

For the reasons set forth below, the court concludes that Defendant, as a matter of law,  is entitled to summary judgment in its favor on all remaining counts.  First, Plaintiff seeks recovery for the allegedly unauthorized funds transfer under Article 4A of the Uniform Commercial Code ("UCC"), codified in Florida in §§ 670.101 *et seq.*, Florida Statutes.  That claim is precluded based on UCC Article 4A's statute of repose, as enacted by Florida Statute § 670.505.   Second, those causes of action that are not directly based on funds transfers are displaced by Article 4A and alternatively, fail as a matter of law.   Finally, as an independent basis for granting summary judgment, the Court finds that the disputed transactions were ratified by Plaintiff's management.

## **Material Facts**

The material facts are not in dispute.  Defendant, Regions Bank ("Regions"), formerly known as Union Planters Bank,[1]  maintained a banking relationship with three affiliated banking institutions, Bancredit Cayman Limited, established in the Cayman Islands ("Bancredit Cayman"), Banco Nacional de Credito, established in the Dominican Republic ("Bancredito-

---

[1]Although Defendant was known as UPB at the time of some of the following transactions, for clarity Defendant shall be referred to as Regions, even when referencing transactions with Union Planters Bank.

DR"), as well as Bancredito, SA, established in Panama ("Bancredito-Panama"). Despite their separate corporate forms, these three banks shared the same official address: Ave. John F. Kennedy Esq., Tiradentes Santo Domingo, Dominican Republic.

In September of 2002, Bancredit Cayman and Defendant entered into a Correspondent Bank Agreement ("CBA") to open a commercial checking account under the name "Bancredito-Cayman Treasury" (the "Bancredit Cayman Checking Account").  The agreement was signed by Bancredit Cayman's official signatories, Ms. Raisa Gil de Fondeur, EVP, and Marina Perez de Garrigo, VP, International Division.  Exhibit F to Regions Bank's Notice of Filing Declaration of Patrick Carrigan in Support of Motion for Summary Judgment on all Counts of the Amended Complaint ("Carrigan Declaration") [CP #36].  Bancredito-Panama and Bancredito-DR entered into similar Correspondent Bank Agreements with Regions and their respective agreements were each signed by EVP, de Fondeur.

The transactions subject of the claims in this proceeding were initiated by Mr.  Eduardo Baldera ("Baldera"), Treasury Manager of Bancredito-DR.  Mr. Baldera was an authorized signatory on the Bancredito-DR accounts, but not on the accounts of  Bancredit Cayman. Exhibit E to Declaration of Richard E. L. Fogerty in Opposition to Regions Bank's Motion for Summary Judgment ("Fogerty Declaration") [CP #48].

On Friday, December 13, 2002, Regions received a wire transfer from Bancredit Cayman's account at Hemisphere National Bank for $13 million with instructions that the full amount be credited to the Bancredit Cayman Checking Account at Regions.  Exhibit G to Carrigan Declaration. That same day, Mr. Baldera sent an email to Luis Quinones, an officer at Regions Bank, indicating that he had initiated the wire transfer and further directing Regions to

debit the Bancredit Cayman Checking Account in order to purchase a certificate of deposit in the amount of $13 million with a maturity of Monday, December 15, 2002.[2]  The email also directed that upon maturity, the proceeds of the CD should be credited to the Bancredit Cayman Checking Account. Exhibit H to Carrigan Declaration.  Regions complied with Mr. Baldera's instructions and purchased the CD in the name of Bancredit Cayman. Exhibit G to Fogerty Declaration.

The following Monday, December 16, 2002, Mr. Baldera faxed a completed application to Mr. Luis Quinones, at Regions, instructing Defendant to open a money market account for Bancredito-DR (the "Bancredito-DR MMA").  Exhibit I to Carrigan Declaration and Exhibit I to Fogerty Declaration. That same day, Regions opened the Bancredito-DR MMA.[3]  Also on

---

[2] In 2002, that Monday in December was actually the 16th.  The CD was eventually purchased with a maturity date of Friday, December 20, 2002.  Fogerty Declaration.

[3] Initially, the money market account shared the same name as Bancredit Cayman's commercial checking account maintained at Regions: Bancredito-Cayman Treasury. Because of the similar name, Plaintiff argues that a genuine issue of material fact exists as to the initial ownership of the money market account.  However, "[t]he mere existence of a scintilla of evidence in support of the [opposing party's] position will not be sufficient to forestall summary judgment."*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986) That legal standard applies here.  After reviewing the evidence in the record, the Court concludes that there is no such genuine issue of material fact; the account was always owned by Bancredito-DR.  The Amended Complaint alleges that the account application was sent to Bancredito-DR.  Amended Complaint ¶ 17.  In the money market account application filled out by the customer, the name of Bancredito-DR's former alias "Bancredito, S.A." appears in the signature block above "Company Name". Page 3 of Exhibit I to Fogerty Declaration. Furthermore, the name of the sole shareholder on the application is Grupo Financiero Nacional ("GFN"), then parent company to Bancredito-DR. Page 3 of Exhibit I to Fogerty Declaration.  GFN never owned any part of Bancredit Cayman.  *See* Exhibit A to Carrigan Declaration (the "Bancredito Organizational Chart"). Moreover, the Place of Incorporation on the application is listed as Santo Domingo, Dominican Republic, not the Cayman Islands. Page 2 of Exhibit I to Fogerty Declaration.

December 16, 2002, Mr. Baldera sent a SWIFT[4] message to Regions with instructions to cancel the Bancredit Cayman CD and credit the proceeds to the Bancredito-DR MMA. Exhibit J to Carrigan Declaration. Regions subsequently complied with these instructions and the proceeds were transferred to the Bancredito-DR MMA.  Exhibit Q to Carrigan Declaration. This is the critical transaction since it is the only one that resulted in funds being transferred from Bancredit Cayman to Bancredito-DR.  Once the proceeds were credited to the Bancredito-DR MMA, all of the transactions initiated by Bancredito-DR that follow were transactions affecting funds unequivocally under the ownership and control of Bancredito-DR.

Three days later, on Thursday, December 19, 2002, Bancredito-DR requested and received two standby letters of credit from Regions in the amounts of $11,300,000.00 and $8,000,000.00.  As support for the letters of credit, Bancredito-DR pledged two certificates of deposit equal to 50% of the value of the respective letters of credit. The two General Pledge Agreements were delivered to Regions on December 19, 2002 and were signed by two authorized signatories of Bancredito-DR who were also authorized signatories on the Bancredit Cayman Checking Account: Marina Perez de Garrigo and Rosangela Pellerano.  Exhibits K and L to Carrigan Declaration. Thereafter, on December 23, 2002, Regions, at the direction of Mr. Baldera, debited the Bancredito-DR MMA in the amounts of $5,650,000.00 and $4,000,000.00 and purchased two certificates of deposit of the same values, with maturity dates of April 31, 2003 and July 31, 2003 respectively.  Exhibit L to Fogerty Declaration.

---

[4]SWIFT is an acronym for Society for Worldwide Interbank Financial Telecommunications. It is a highly secured private communications system for the financial community. SWIFT does not transfer money, it merely acts a secure link between institutions to exchange messages about money.

Shortly after December 31, 2002, Regions issued a monthly account statement for both the Bancredit Cayman Checking Account and the Bancredito-DR MMA reflecting the activity for the month of December 2002. Exhibits P and Q to Carrigan Declaration. Regions sent both statements to the official address for Bancredit Cayman and Bancredito-DR, which, as noted earlier, is the same address: Ave. John F. Kennedy Esq., Tiradentes Santo Domingo, Dominican Republic. The statements reflect that the Bancredit Cayman CD proceeds were deposited in the Bancredito-DR MMA, not in the Bancredit Cayman Checking Account.  Specifically, the Bancredit Cayman Checking Account statements do not reflect a credit to that account on either Monday, December 16, 2002, the day the $13 million CD was cancelled, or on Friday, December 20, 2002, the date the $13 million CD was due to mature. Exhibit P to Carrigan Declaration. Conversely, the December 2002 statement for the Bancredito-DR MMA does reflect a credit of $13,001,895.83 (the proceeds of the Bancredit Cayman CD) on December 16, 2002.  Exhibit Q to the Carrigan Declaration.

For reasons not in the record but also not material, the contemplated Bancredito-DR letter of credit transactions did not occur.  On January 3, 2003, the $5.65 million Bancredito-DR CD was cancelled.  Exhibit L to Fogerty Declaration. The proceeds were then deposited back in the Bancredito-DR MMA.  Exhibit S to Carrigan Declaration.  On January 7, 2003, Regions debited $3 million from the Bancredito-DR MMA and transferred $3 million to Bancredit Cayman's account at HNB.  Exhibits R and W to Carrigan Declaration.  Two days later, on January 9, 2003, Regions debited $4 million from the Bancredito-DR MMA, internally credited the Bancredit Cayman Checking Account and then subsequently wire transferred that same amount to Bancredit Cayman's account at HNB. Exhibits T, U and W to Carrigan Declaration.  Thus, at

this point, of the original $13 million allegedly transferred to Bancredito-DR without proper authorization, $7 million had been returned to Bancredit Cayman.

On January 15, 2003, Mr. Baldera sent an authenticated SWIFT message to Regions requesting that the name of the Bancredito-DR MMA be changed from "Bancredit-Cayman Treasury" to "Bancredito-Money Market." Exhibit V to Carrigan Declaration.  As explained at n.3 *supra*, this name change did not affect ownership or control of the funds in the account. From its inception, the Bancredito-DR MMA was a Bancredito-DR account.

Shortly after January 31, 2003, Regions issued a statement for the Bancredito-DR MMA reflecting a credit for the $5.65 million CD, plus interest, as well as debits of $3 million and $4 million, respectively.  Exhibit W to Carrigan Declaration. This statement was sent to the address of record for both Bancredit Cayman and Bancredito-DR.

It was not until July 9, 2003 that Regions cancelled the other Bancredito-DR CD in the amount of $4 million and credited the Bancredito-DR MMA.  Regions then dispersed the proceeds of this CD to third parties, at the direction of Bancredito-DR.  Carrigan Declaration. Thus, as of July 31, 2003, Regions no longer held any funds traceable to the $13 million subject of the original allegedly unauthorized transfer of funds in either the Bancredito-DR MMA or the Bancredit Cayman Checking Account.

On September 4, 2003, the Cayman Island Monetary Authority ("CIMA") appointed Don W. Ebanks and Gordon I. MacRae as Controllers of Bancredit Cayman ("Controllers").[5]  That same day, the Controllers sent a Fax Message that notified Regions of their appointment and

---

[5] On March 15, 2004, Richard E. L. Fogerty replaced Don Ebanks as Controller of Bancredit Cayman.

asked for information regarding Bancredit Cayman's accounts with Regions. Exhibits Q to Fogerty Declaration. The Fax Message asks Regions to provide details regarding Bancredit Cayman's accounts, records and assets. It also directs Regions not to proceed with any transactions with respect to Bancredit Cayman's accounts without express prior agreement from the Controllers. This Fax Message is significant because the alleged failure by Regions to comply with these instructions forms the basis of Plaintiff's Count II breach of contract claim.

In October of 2003, Regions sent the Controllers the Bancredit Cayman Checking Account statements for the period covering November 2002 to September 2003. Those statements reflected the December 13, 2002, $13 million wire transfer from HNB and the subsequent debit to purchase the $13 million CD. As described earlier, those statements did not reflect a corresponding credit for the proceeds of the $13 million CD. In fact, in a fax dated October 17, 2003, the Controllers acknowledged that the original $13 million CD transaction "was subsequently cancelled and the funds transferred to Banco Nacional de Credito [Bancredito-DR]."[6] *See* Exhibit U to Fogerty Declaration.

On April 9, 2004, Regions sent the Controllers a copy of the $13 million wire, a copy of the Bancredit Cayman Checking Account statements reflecting the $13 million credit and debit used to establish the CD, a copy of the December 16, 2002 SWIFT message from Baldera to Regions requesting that the proceeds of the CD be utilized to establish the Bancredito-DR MMA, Bancredito-DR MMA statements showing a credit of the CD proceeds, and statements for August, September and October 2003 for the Bancredit Cayman Checking Account. Exhibit

---

[6] Banco Nacional de Credito was the former name of Bancredito-DR. *See* Exhibit A to Carrigan Declaration.

FF to Carrigan Declaration. As discussed later, these documents put Bancredit Cayman on notice of the allegedly unauthorized transfer of the Bancredit Cayman CD proceeds to the Bancredito-DR MMA on December 16, 2002.

On May 31, 2004, the Grand Court of the Cayman Islands appointed Richard Fogerty and G. James Cleaver as the Joint Official Liquidators of Bancredit Cayman.  Two months later, on July 31, 2004, they issued their first report.  Section 5.1.2 of this report referenced the original $13 million CD and concluded that management of Bancredit Cayman "cancelled it [the Bancredit Cayman CD] to settle outstanding inter-company loans and the proceeds were used by Banco Nacional [Bancredito-DR] prior to the appointment of Controllers in order to comply with cash commitments to its customers." Exhibit W to Fogerty Declaration.  The second status report on record with the court was issued on June 3, 2005 and reaffirms in paragraph 6.1.2 that "management has previously stated that the initial certificate of deposit was cancelled to settle outstanding inter-company loans and was used by Bancredito[-DR] to comply with cash commitments to its customers." Exhibit 5 to Region's Motion for Summary Judgment [CP #33].

**Procedural History**

On May 10, 2006, the Joint Official Liquidators filed a petition under Chapter 15 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York.  On June 16, 2006, that court entered an order that recognized Debtor's liquidation proceedings in the Cayman Islands as a foreign main proceeding as defined in § 1517(b)(1) of the Bankruptcy Code.  The court also recognized the Joint Official Liquidators as Bancredit Cayman's Foreign Representatives under Chapter 15 of the Bankruptcy Code.  Thereafter, on June 30, 2006, the Foreign Representatives were granted authority to file suit on behalf of Bancredit Cayman in the

United States in furtherance of their activities as Joint Official Liquidators of Bancredit Cayman. On December 12, 2007, the Foreign Representatives commenced this adversary proceeding against Regions.

On May 1, 2008, Plaintiff filed its Amended Complaint.  On May 27, 2008 Regions filed its Motion for Summary Judgment on all Counts of the Amended Complaint [CP #33], as well as Regions Bank's Memorandum of Law in Support of its Motion for Summary Judgment on all Counts of the Amended Complaint [CP #34], and Regions Bank's Notice of Filing Exhibits in Support of its Motion for Summary Judgment on all Counts of the Amended Complaint [CP #35] (together the "Motion for Summary Judgment").

On September 3, 2008, the Court conducted a hearing on the Motion for Summary Judgment.  The Court has considered the arguments of counsel presented at the hearing, reviewed applicable law and reviewed the record, including the Amended Complaint [CP #28], the Motion for Summary Judgment, the Plaintiff's Response to the Motion for Summary Judgment [CP #47] and Bancredit Cayman's Response to Regions Statement of Undisputed Facts and Counterstatement of Facts [CP #49] (together the "Response"), and Defendant Regions Bank's Reply Memorandum of Law in Support of Motion for Summary Judgment (the "Reply") [CP #61].  The Court has also considered the Carrigan Declaration filed by Regions, Regions Bank's Notice of Filing Declaration of Frank J. Roza in Support of Motion for Summary Judgment on all Counts of the Amended Complaint ("Roza Declaration") [CP #37], the Fogerty Declaration, as well as all the Exhibits attached to the respective Declarations and Pleadings. The following opinion constitutes the Court's findings of fact and conclusions of law on the legal issues raised in the Motion for Summary Judgment. As noted earlier, after the hearing on

Defendant's Motion for Summary Judgement, Plaintiff filed its Notice of Voluntary Dismissal, Without Prejudice of Counts  III, IV, V, VI, VII, VIII in part, and IX [CP #74]; leaving at issue Counts I and II (for Breach of Contract), part of Count VIII (for Accounting), Count X (for Turnover) and Count XI (for Violation of § 670.203, Florida Statutes).

### Discussion

At the heart of the Amended Complaint is Plaintiff's allegation that Defendant, in a series of unauthorized actions, transferred $13 million from accounts owned and controlled by Bancredit Cayman to accounts of an affiliate, Bancredito-DR.  Plaintiff states that the unauthorized transfers were both breaches of contract and a violation of UCC Article 4A. Defendant argues that any common law relief stemming from these transactions should be displacd by Article 4A and consequently precluded by the one year statute of repose in Florida Statute § 670.505.  The Court holds that of the several transactions alleged in the Amended Complaint, only one of these transactions was a funds transfer under Article 4A:  the transfer of the proceeds of the Bancredit Cayman CD to the Bancredito-DR MMA on December 16, 2002. The Court also holds that because the Plaintiff had actual notice of the transaction prior to one year before the filing of this complaint, it is untimely.  In addition, to the extent the complaint alleges other independent breaches of contract, those actions are both displaced by Article 4A and fail as a matter of law.  As a separate basis for granting the Motion for Summary Judgment, the Court finds that management for Bancredit Cayman undisputedly ratified the allegedly unauthorized transactions, thus barring recovery as a matter of law.

**A.**    **Legal Standard**

Summary judgment is appropriate where the moving party demonstrates that there are

no genuine issues of material fact and that it is entitled to judgment as a matter of law. Fed.

R. Civ. P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). To defeat a motion for

summary judgment, the non-moving party must do more than simply show that there is some

doubt as to the facts of the case. "The mere existence of a scintilla of evidence in support of

the [opposing party's] position will not be sufficient to forestall summary judgment."

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986). Thus, once the moving party has

established its burden of proof, the party opposing the motion for summary judgment must

establish the existence of a genuine issue of material fact and may not rest upon its pleadings

or mere assertions of disputed facts to defeat the motion. *Matsushita Elec. Ind. Co., Ltd. v.*

*Zenith Radio Corp*., 475 U.S. 574, 586 (1986).

### B.    Article 4A and Funds Transfers

Article 4A of the Model Uniform Commercial Code ("UCC"), as enacted by Florida

Statutes §§ 670.101 *et seq*.,  intends to create a comprehensive body of law defining rights and

obligations stemming from electronic payment orders and funds transfers.  *See* Official

Comment to UCC  § 4A-102 .  Prior to its enactment, a rapidly evolving technological

environment coupled with misapplied judicial interpretations of other statutory schemes led to

uncertainty in the financial marketplace; in particular, analogies to traditional negotiable

instrument law were misplaced and of little guidance in the electronic funds transfer realm. *See*

Official Comment to UCC  § 4A-102; *Banque Worms v. BankAmerica Intern*., 77 N.Y.2d 362,

369 (N.Y. 1991).  Therefore, "[i]n drafting UCC Article 4A, ... a deliberate decision was also

made to use precise and detailed rules to assign responsibility, define behavioral norms, allocate

risks and establish limits on liability, rather than to rely on broadly stated, flexible principles."

-12-

Official Comment to UCC § 4A-102; *see also Zengen, Inc. v Comerica Bank*, 41 Cal.4th 239,

252 (Cal. 2007) (quoting the Official Comment to UCC § 4A-102).

Fundamental to the scope of Article 4A are the definitions of the terms "funds transfer"

and "payment order". UCC § 4A-102 (addressing the subject matter of Article 4A, "this Article

applies to funds transfers defined in Section 4A- 104."). The UCC defines a funds transfer as

"the series of transactions, beginning with the originator's payment order, made for the purpose

of making payment to the beneficiary of the order." UCC § 4A-104(a). A "payment order" is

defined as:

> an instruction of a sender to a receiving bank, transmitted orally,
> electronically, or in writing, to pay, or cause another bank to pay, a fixed or
> determinable amount of money to a beneficiary if: (i) the instruction does not
> state a condition to payment to the beneficiary other than time of payment,
> (ii) the receiving bank is to be reimbursed by debiting an account of, or
> otherwise receiving payment from, the sender, and (iii) the instruction is
> transmitted by the sender directly to the receiving bank or to an agent,
> funds-transfer system, or communication system for transmittal to the
> receiving bank.

UCC § 4A-103(a)(1).

A typical funds transfer takes place when X, with an account at Bank A, instructs Bank

A to pay Y, who also has an account at Bank A, a certain amount of money. Bank A then makes

a credit to Y's account and notifies Y that the amount is immediately withdrawable. When Bank

A notifies Y of the credit, it is deemed to have accepted the payment order and incurred an

obligation to Y; in turn, when Bank A accepts the payment order, X is deemed to have incurred

an obligation to Bank A. In this case, X is the "sender", the instruction is the "payment order",

Bank A is both the "receiving bank" and the "beneficiary bank", and Y is the "beneficiary".

UCC § 4A-103(a)(2)-(5). Although this factual scenario is the most common type of funds

transfer, there are other variations, which are not material to the facts in this case.[7]

Here, the Court has been asked to consider a series of transactions and determine which of these are funds transfers within the scope of Article 4A.  At issue are three transactions:

1.    December 13, 2002 - the purchase of a $13 million certificate of deposit using funds from the Bancredit Cayman Checking Account;

2.    December 16, 2002 - the transfer of the proceeds of the $13 million CD into the Bancredito-DR MMA;

3.    December 23, 2002 - the purchase of two certificates of deposit in amounts of $4 million and $5.65 million, respectively, using funds from the Bancredito-DR MMA.

Defendant maintains that all three of these transactions are funds transfers and therefore fall under the ambit of Article 4A.  Plaintiff argues that only the second transaction constitutes a funds transfer as defined by Article 4A, and that the funding of the CD's is better classified as an investment.

The issue of whether the funding of a certificate of deposit is a funds transfer was addressed in *Centre-Pointe Merchant Bank Ltd. v. American Exp. Bank Ltd.*, 913 F.Supp. 202, 206 (S.D.N.Y. 1996).  In that case, plaintiff instructed defendant bank to debit its account and invest the money in a 90 day fixed deposit.  The court held that these instructions did not constitute a payment order or a funds transfer under UCC § 4A-104 finding that the instructions did not include a beneficiary and provided discretion as to how the money should have be invested. *Id.* at 208.  Here, the same is true.  Baldera's December 13, 2002 instructions to purchase a certificate of deposit did not provide a beneficiary and gave Regions full discretion to determine in which fixed account to deposit the money.  Exhibit F to Fogerty Declaration.  As

---

[7] *See* Official Comment to UCC § 4A-104 for a comprehensive discussion of the various permutations of funds transfers.

the court held in *Centre-Pointe*, Article 4A "does not contemplate coverage of the type of open-ended investment instruction at issue here." *Id.*

Furthermore, the term "certificate of deposit" does not appear anywhere in the text of UCC Article 4A.  The term does appear in Article 3, however.  UCC § 3-104(j) defines a certificate of deposit as "an instrument containing an acknowledgment by a bank that a sum of money has been received by the bank and a promise by the bank to repay the sum of money. A certificate of deposit is a note of the bank." UCC § 3-104(j).  Since a certificate of deposit is an instrument, not an account, issues arising from transactions involving a certificate of deposit are traditionally analyzed within the framework of Article 3.[8]  Therefore, the Court holds as a matter of law that the purchase of time deposits are not funds transfers governed by Article 4A.  This conclusion is in concert with the legislative history explained in the Official Comment to UCC § 4A-102, which states that Article 4A was drafted in order to deal with the shortfalls of negotiable instrument law as applied to electronic funds transfers.

The parties stipulate that the December 16, 2002 transaction is a funds transfer as defined by UCC § 4A-104(a).  In fact, the transfer is much like the hypothetical discussed above. Baldera's SWIFT message to Defendant was a payment order.  Defendant was both the receiving bank and the beneficiary bank.  Bancredit Cayman was the sending bank and Bancredito-DR was the beneficiary.  Because this transaction was a funds transfer, the rights and obligations of the respective parties with respect to this transaction are exclusively governed by Florida's UCC. Since the December 16, 2002 transfer of proceeds from the Bancredit Cayman CD to the

---

[8] This is true even though a certificate of deposit is typically issued in the name of an account holder.

Bancredito-DR MMA is the only Article 4A funds transfer, for future reference in this opinion, this transfer will be referred to as the "Funds Transfer."

> ### C.    Plaintiff's Article 4A Claim is
> ###        Precluded by the One Year Statute of Repose

Defendant argues that Plaintiff's Article 4A claim is barred by the one-year statute of repose set forth in § 670.505, Florida Statutes.  That section states that when a bank receives an allegedly unauthorized funds transfer:

> [T]he customer is precluded from asserting that the bank is not entitled to retain the payment unless the customer notifies the bank of the customer's objection within one year after the notification was received by the customer.

Fla.Stat. § 670.505.   Thus,"the obligation to refund may not be asserted by the customer if the customer has not objected to the debiting of the account within one year after the customer received notification of the debit." Official Comment to Fla.Stat. § 670.505. Courts and treatises alike have characterized this section of the code as a statute of repose.  *See, e.g.*, Official Comment to Fla.Stat. § 670.505; Fl. Jur. 2d Banks & Lending Institutions § 377; 3 James J. White & Robert S. Summers, Uniform Commercial Code, § 24-8 (5th ed. 2008).[9]

Plaintiff argues that it is not barred by the statute of repose because it never received actual notice of the allegedly unauthorized transactions. The record facts prove otherwise.  Not

---

[9]  A similar duty to object within one year of notification was set forth in the CBA, which states, in relevant part:

> Correspondent shall be precluded from asserting any claim against Union Planters with respect to the Payment Order (or from otherwise objecting to any debit therefor to Correspondent's account), unless Correspondent has notified Union Planters in writing of any error or discrepancy with regard to a Payment Order within one (1) year from the date of Correspondent's earliest receipt of notification of the Payment Order.

The Court need not consider the contractual provision, however, since the statute of repose set forth above is controlling.

only did management for Bancredit Cayman have actual knowledge of the transactions, Bancredit Cayman received notification of the allegedly unauthorized wire transfers via account statements mailed regularly to management, as well as additional document production delivered to the Controllers and the Foreign Representatives as more specifically described below.

Indeed, Plaintiff has offered no evidence to rebut the notice evidenced by these documents. Instead, Plaintiff argues that because the Bancredit Cayman Checking Account statements only show the $13 million debit from that account, and not the subsequent credit of the CD proceeds to the Bancredito-DR MMA, that is not enough to amount to actual notice of the allegedly unauthorized transaction under Florida Statute § 670.505.

The following undisputed evidence in the record undermines Plaintiff's lack of notice argument. First, Bancredit Cayman received regular statements reflecting the account activity for the Bancredit Cayman Checking Account. It also arguably received regular statements for the Bancredito-DR MMA since Bancredit Cayman and Bancredito-DR shared a mailing address and at least two senior management, Rosangela Pellerano and Marina Pérez de Garrigó.[10] Nevertheless, even if the Court were to conclude that Bancredit Cayman did not receive regular statements and therefore had no actual notice of the disputed transactions, it is undisputed that by April 9, 2004, the Controllers had copies of the following documents:

- the original $13 million wire into the Bancredit Cayman Checking Account;
- the December 2002 statement for the Bancredit Cayman Checking Account showing the original credit and subsequent debit to purchase the $13 million Bancredit Cayman CD;

---

[10] Knowledge of the second disputed CD transaction also may be imputed on Bancredit Cayman as Rosangela Pellerano and Marina Pérez de Garrigó were management responsible for pledging the Bancredito-DR CD's with respect to the contemplated letter of credit transactions.

- the December 16, 2002 SWIFT message from Baldera requesting that the proceeds of the Bancredit Cayman CD be used to establish the Bancredito-DR MMA;
- the December 2002 Bancredito-DR MMA statement showing a credit for the proceeds of the Bancredit Cayman CD; and
- the account statements for the Bancredit Cayman Checking Account for the months of August, September and October 2003.

Exhibit FF to Carrigan Declaration.

In addition to the foregoing undisputed evidence, Plaintiff evidenced its actual knowledge of the disputed transaction by no later than July 31, 2004. In a fax message dated October 17, 2003, sent on behalf of Gordon I. MacRae, Joint Controller, by a Ms. Eleanor G. Fisher to an agent at Regions, Plaintiff specifically expressed its knowledge of both the original CD purchase and the subsequent Funds Transfer to Bancredito-DR by stating that: "the CD was subsequently cancelled and the funds transferred to Banco Nacional de Credito [Bancredito-DR]." Exhibit U to Fogerty Declaration; Exhibit EE to Carrigan Declaration. Moreover, as of July 31 2004, the Joint Official Liquidators admitted in their own report that: "[a]ccording to management, it [the Bancredit Cayman CD] was cancelled to settle outstanding inter-company loans and the proceeds were used by Banco Nacional [Bancredito-DR] prior to the appointment of Controllers in order to comply with cash commitments to its customers." Exhibit W to Fogerty Declaration; Exhibit 4 to Motion for Summary Judgment. Therefore, there is no genuine issue of fact that Bancredit Cayman had notice of the disputed Funds Transfer more than a year before bringing this complaint.[11]

---

[11] Plaintiff argues that the critical date is the order of recognition entered by the Bankruptcy Court for the Southern District of New York on June 16, 2006. This argument is based on the further argument that § 108 of the Bankruptcy Code, which extends certain deadlines, applies in a Chapter 15 case. Whether or not § 108 applies here is irrelevant since the one year statute of repose expired prior to the order of recognition in the Chapter 15 case.

In a futile effort to avoid application of the statute of repose, Plaintiff argues that because of the nature of its role as Joint Official Liquidators, it should not be bound by the statute even if the statute would have barred claims by Bancredit Cayman.  The Court finds this argument to be wholly inconsistent with the law.  As the Defendant correctly noted in its reply brief, "under Florida law, ... a receiver steps into the shoes of, and has no rights separate from, the represented entity." *Freeman v. Dean Witter Reynolds, Inc.*, 865 So.2d 543, 550 (Fla. 2d DCA 2003); *see also Trigo v. FDIC*, 847 F.2d 1499, 1501 (11th Cir. 1988) ("A bank liquidator, ... stands in the shoes of the bank it represents and enjoys precisely the same rights and interests.") Thus, not only are the Joint Official Liquidators subject to the statute of repose, but they are also limited to the rights Bancredit Cayman possessed as of May 31, 2004, the date the Liquidators were appointed by the Grand Court of the Cayman Islands.

In sum, there is no genuine issue of fact that Plaintiff had actual notice of the allegedly unauthorized December 16, 2002 Funds Transfer from Bancredit Cayman to Bancredito-DR more than a year before the filing of this complaint and to the extent relevant, more than one year prior to the order of recognition in its Chapter 15 case.  Therefore, as a matter of law, its claim that the December 16, 2002 transfer violated Florida Statute § 670.203 is barred by the one year statute of repose set forth in Florida Statute § 670.505 and Defendant is entitled to summary judgment on Count XI of the Amended Complaint.

### D.   Plaintiff's Breach of Contract Claims are Displaced by Article 4A

The Court now turns to the breach of contract claims in Counts I and II of the Amended Complaint.  The parties agree that Florida law governs, but disagree over whether these claims are controlled by Florida common law or the statutory language of Florida's UCC.  Plaintiff

asserts that the allegations set forth in these counts allege independent breaches and are therefore governed by the common law.  Defendant argues that since the alleged harms arise solely from the allegedly unauthorized Funds Transfer, Florida's UCC exclusively governs these claims and displaces the breach of contract claims.[12]

It is well settled Florida law that the UCC displaces the common law to the extent it is inconsistent therewith. *Tingley Systems, Inc. v. HealthLink, Inc.*, 509 F.Supp.2d 1209, 1214 (M.D.Fla.2007).  Florida Statutes §§ 670.101, *et seq*. adopt UCC Article 4A with respect to funds transfers.  These sections were enacted and intended to exclusively govern the rights and obligations of the parties to funds transfers. *Corfan Banco v. Ocean Bank*, 715 So.2d 967, 971 n. 5 (Fla. 3d DCA 1998) ("The uniformity and certainty sought by the statute for these transactions could not possibly exist if parties could opt to sue by way of pre-Code remedies where the statute has specifically defined the duties, rights and liabilities of the parties."); *Zengen, Inc. v Comerica Bank*, 41 Cal.4th 239, 252 (Cal. 2007). As stated in the Official Comment:

> In the drafting of these rules, a critical consideration was that the various parties to funds transfers need to be able to predict risk with certainty, to insure against risk, to adjust operational and security procedures, and to price funds transfer services appropriately ... The rules that emerged represent a careful and delicate balancing of those interests and are intended to be the **exclusive** means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of this Article.

---

[12] The parties here use the word "preempt" when discussing the effect of Florida's Commercial Code on state common law causes of action.  Cases addressing the issue also often use the word preemption.  As noted in *Zengen, Inc. v Comerica Bank*, 41 Cal.4th 239, 247 n. 5 (Cal. 2007), the term is misapplied.  The doctrine of preemption deals with the interaction between federal and state law, or state and local law; not, as is the case here, the interaction between state statutes and state common law. Accordingly, the Court will use the term "displacement" when discussing whether Florida's Commercial Code bars certain common law causes of action.

Official Comment to Fla. Stat. § 670.102 (emphasis added). In this case, Defendant argues that because each of Plaintiff's common law claims stem from the allegedly unauthorized December 16, 2002 Funds Transfer, those claims should be displaced by Florida's UCC.

Defendant cites *Covina 2000 Ventures Corp. v. Merrill Lynch, Pierce, Fenner & Smith*, 2008 WL 1821738 (S.D.N.Y. 2008). In that case, the plaintiff customer sued the defendant bank for executing numerous unauthorized wire transfers under common law theories of breach of contract, breach of fiduciary duty, fraud, conversion, negligence, and breach of the covenant of good faith and fair dealing. Defendant sought summary judgment and argued that UCC Article 4A governed the disputed transactions and that the claims were barred by the statute's one-year limitation period. *Id.* at *2. The *Covina* court found that the plaintiff's common law "claims derive entirely from allegedly unauthorized wire transfers; they seek to vindicate their rights and hold their bank liable for these transfers. Thus the parties' rights and obligations with respect to unauthorized transfers are furnished by Article 4-A." *Id.* at *3. The court granted summary judgment in favor of the defendant bank since the plaintiff received actual notice of the allegedly unauthorized transfers and did not complain within the one year statute of repose.

In its attempt to separately prosecute its breach of contract claims, Plaintiff cites several cases for the proposition that "where a party seeks common law or contractual recovery for *other* wrongful acts which do not involve the funds transfer, the common law claims stand independent of the UCC claims and accordingly are not preempted." Plaintiff's Response at 7 (emphasis added). Plaintiff relies heavily on *Schlegel v. Bank of America*, 628 S.E.2d 362 (Va. 2006). In that case, the plaintiff contended that the defendant bank had improperly allowed an unauthorized funds transfer from a corporate account to a personal consumer account and

subsequently had improperly put a freeze on the funds.  The court found that while the funds transfer was controlled by Article 4A, the subsequent, discrete act of freezing the funds gave rise to a distinct cause of action against the bank.  *See also Centre-Pointe Merchant Bank Ltd. v. American Exp. Bank Ltd.*, 913 F.Supp. 202, 206 (S.D.N.Y. 1996) ("The exclusivity of Article 4-A is deliberately restricted to any situation covered by particular provisions of the Article. Conversely, situations not covered are not the exclusive province of the Article. In fact, the Official Comment tacitly states that resorting to principles of law or equity outside of Article 4-A is acceptable, so long as it does not create rights, duties and liabilities inconsistent with those stated in this Article.") (internal citations omitted).

The Court agrees with each side's statement of the law.  Under the Florida Uniform Commercial Code, if the rights and duties of the parties stem from a funds transfer, those shall be governed exclusively by the Code.  However, where there is an independent cause of action, those counts survive displacement and are controlled by Florida common law.

To determine the issue, it is necessary to analyze the allegations in Counts I and II. Count I alleges five independent breaches of the Correspondent Bank Agreement:

1. Permitting Baldera to purchase the $13 million Bancredit Cayman CD;
2. Allowing Baldera to open the Bancredito-DR MMA;
3. Allowing Baldera to cancel the $13 million Bancredit Cayman CD and transfer the proceeds to the Bancredito-DR MMA;
4. Allowing Bancredito-DR to purchase two subsequent CD's from the funds in the Bancredito-DR MMA; and
5. Allowing Bancredito-DR to change the name of the Bancredito-DR MMA from "Bancredito-Cayman Treasury" to "Bancredito-Money Market."

*See* Amended Complaint at pages 10-11.  The Court has already determined that the third act is a funds transfer and is therefore displaced by Article 4A, and precluded by the statute of repose.

Thus, the issue before the court is whether a breach of contract claim based on the other four acts is displaced by Article 4A.

Count II alleges a separate breach of the Correspondent Bank Agreement based upon the following acts:

1.    Failing to turnover funds remaining in the Bancredito-DR MMA;
2.    Failing to prevent the unauthorized disbursement of those funds; and
3.    Failing to disclose information about the funds held in the Bancredito-DR MMA.

*See* Amended Complaint at page 12.

The breach of contract claims in Count I and Count II do not fall neatly into the holdings of the cases cited by each side.  Unlike cases like *Covina* or *Zengen*, the common law claims here are not based solely on the allegedly unauthorized funds transfer governed by Article 4A. *See Covina*, 2008 WL 1821738 at *3 ("Plaintiff's claims derive entirely from allegedly unauthorized wire transfers"); *Zengen*, 41 Cal. 4th 239, 250 ("[T]he gravamen of each of *Zengen*'s causes of action against the Bank, including the one based on the California Uniform Commercial Code, is the same: The Bank should not have accepted and executed the fraudulent payment orders.").  However, unlike cases cited by Plaintiff, including *Schlegel*, the common law claims are not based on acts which resulted in any harm separate from that caused by the Funds Transfer.

Faced with no binding or compelling precedent, the Court returns to the clearly stated policies reflected in Article 4A and the Official Comment thereto and concludes that Plaintiff's common law claims here are displaced by Article 4A.  As cited earlier, the Official Comment intends that Article 4A "be the exclusive means of determining the rights, duties and liabilities of

the affected parties in any situation covered by particular provisions of this Article." Fla. Stat. §

670.102 Official Comment.  Although Plaintiff attempts to fence off its breach of contract claims

as separate and independent acts outside of the scope of Article 4A, the Court's acceptance of

this artificial barrier would lead to a result contrary to the drafters' clear intent, also stated in the

Official Comment, namely that "resort to principles of law or equity outside of Article 4A *is not*

*appropriate to create rights, duties and liabilities inconsistent with those stated in this Article*."

*Id.* (emphasis added).

Despite the number of transactions alleged in the Amended Complaint, the loss suffered

by the Plaintiff occurred only when, and solely because of the Funds Transfer.  Nothing that

happened before or after independently caused this loss or any other loss.  For example, even if

Baldera was not authorized to direct the purchase of the Bancredit Cayman CD from funds in the

Bancredit Cayman Checking Account, this allegedly unauthorized act did no harm.  The funds

remained in the name of Bancredit Cayman.

The acts alleged in Count I which occurred after the Funds Transfer into the Bancredito-

DR MMA also caused no harm independent of the Funds Transfer.  Allowing Bancredito-DR to

purchase Bancredito-DR CDs from the funds in the Bancredito-DR MMA is of no consequence.

The funds were already in a Bancredito-DR account.  Similarly, allowing Bancredito-DR to

change the name on the account in January 2003 is of no consequence, since, as stated earlier,

the MMA was from its inception a Bancredito-DR account.

The breach of contract claims in Count II are also displaced by Article 4A.  The claims

are based on requests made by the Controllers in September of 2003.  Unlike in *Schlegel*, where

the plaintiff specifically requested turnover of funds in an identified bank account and the bank

-24-

maintained a freeze on the account, the instructions or requests in the September 10, 2003 Fax Message to Regions solely related to Bancredit Cayman and its accounts and assets, not monies in the account of Bancredito-DR.  To allege that these requests required Regions to "undo" the Funds Transfer and turn over money in Bancredito-DR's account is essentially just another attack on the Funds Transfer it can no longer attack under Article 4A.  Thus, the Court concludes that the breach of contract claims in Count II are also displaced by Article 4A.

In sum, to allow Plaintiff to pursue its breach of contract claims and pursue recovery of all or some of the money subject of the Funds Transfer would be to do what the Official Comment to Article 4A expressly finds wrong - create rights in the Plaintiff and liabilities of the Defendant inconsistent with Article 4A.  Simply stated, Plaintiff cannot indirectly attack the Funds Transfer, which is immune from attack under Article 4A, by asserting tangential, wrongful acts which, upon scrutiny, are of no legal consequence in the absence of the Funds Transfer.  Thus, the contract claims are displaced.

     **E.**     **Even if not Displaced, the Breach of
                    Contract Claims Fail as a Matter of Law**

Even if the Court adopted a narrow (and inappropriate) view of the scope of Article 4A and found that Counts I and II were not displaced, the breach of contract claims in both of these counts would fail as a matter of law.

As described earlier, the alleged wrongful acts in Count I consist of (1) permitting Baldera to purchase the Bancredit Cayman CD, (2) allowing Baldera to open the Bancredito-DR MMA,  (3) allowing Bancredito-DR to purchase two CD's from the funds in the Bancredito-DR MMA, and (4) permitting Baldera to change the name of the Bancredito-DR MMA.  The Court finds that even if these causes of action are not displaced by Florida's UCC, these claims fail to

state a claim for which relief can be granted.

To state a claim for breach of contract a plaintiff must allege that a contract existed, allege breach of that contract and allege damages arising from the breach. *See AIB Mortgage Company v. Sweeney*, 687 So.2d 68 (Fla. 3d DCA 1997) (*citing Knowles v. C.I.T. Corp.*, 346 So.2d 1042 (Fla. 1st DCA 1977)).  In Count I of the Amended Complaint, Plaintiff alleges that Regions breached its CBA with Bancredit Cayman by permitting Baldera to take several actions on behalf of Bancredit Cayman without proper authority.  Many of these allegations involve the Bancredito-DR MMA.  While Plaintiff asserts that the money market account belonged initially to Bancredit Cayman, the Court has already determined *supra*, that the Bancredito-DR MMA was opened by Bancredito-DR and was always a Bancredito-DR account.  Thus, while Plaintiff lacks standing to challenge a breach of the CBA between Regions and Bancredito-DR, more succinctly, it fails to allege any breach of the CBA between Regions and Bancredit Cayman.  Under the same rational, it also fails for lack of damages. Specifically, Bancredit Cayman did not suffer damages when its affiliate, Bancredito-DR, opened a money market account at Regions.  Nor did Bancredit Cayman suffer damages when its affiliate, Bancredito-DR changed the name of its own money market account.  Finally, Bancredit Cayman did not suffer damages when its affiliate used funds in its own money market account to purchase two certificates of deposit.

Count I also alleges that Regions breached its CBA with Bancredit Cayman by allowing Baldera to purchase the original $13 million CD in the name of Bancredit Cayman.[13]  However,

---

[13]  Similarly, and of particular interest, is the fact that Plaintiff has not alleged that the initial $13 million wire transfer from Bancredit Cayman's account at HNB to its account at Regions was either unauthorized under Article 4A or a breach of its CBA, as it appears from the evidence on the record that this transaction was also initiated by Mr. Baldera.

this alleged act, even if a breach of the CBA, also fails for lack of damages. The purchase of a CD on behalf of Bancredit Cayman from funds in the Bancredit Cayman Checking Account cannot be said to have directly or even indirectly caused any damage to the Plaintiff. The damages Plaintiff seeks stem solely from the later unauthorized Funds Transfer to the Bancredito-DR MMA. In short, viewed separately from the Funds Transfer, the Plaintiff has suffered no damages as a result of the alleged breaches of contract. Therefore, the remaining allegations in Count I of the Amended Complaint fail to state a claim upon which relief can be granted.

In Count II of the Amended Complaint, Plaintiff does allege damages, namely, the $3,247,000 which allegedly remained in the Bancredito-DR MMA in September, 2003. As described earlier, Plaintiff alleges that Regions breached the Bancredit Cayman CBA by not accounting for and turning over these funds when contacted by the Controllers on September 4, 2003. Unlike Count I, which alleges a breach but no damages independent of the Funds Transfer, Count II fails for the opposite reason: it asserts arguably independent damages, but the undisputed facts in the record prove that there was no breach.

Count II is premised on Regions' alleged failure to take action with respect to the funds remaining in the Bancredito-DR MMA in response to the September 4, 2003 Fax Message. That message advised Regions of the appointment of the Controllers and asked Regions to provide details regarding Bancredit Cayman's accounts, records and assets. It also directs Regions not to proceed with any transactions with respect to Bancredit Cayman's accounts without express prior agreement from the Controllers. Exhibit Q to Fogerty Declaration.

The fatal flaw in Count II is that there are no facts in the record which would establish

that the notification in the Fax Message contractually obligated Regions to account for, or turnover to the Controllers, the funds in the Bancredito-DR MMA or contractually obligated Regions to freeze the funds left in the Bancredito-DR MMA.  As noted, the Fax Message refers only to records, accounts and assets of Bancredit Cayman.  It makes no mention of accounts, records or assets of Regions' separate customer, Bancredito-DR.  Moreover, there are no facts which could support a theory that Regions was otherwise on notice of improper transfers from Bancredit Cayman to Bancredito-DR and thus, under some contractual duty to investigate the accounts of Bancredito-DR.

The undisputed facts establish the contrary.  As of 2003, no officer or representative of Bancredit Cayman had advised Regions that funds may have been transferred without authorization from Bancredit Cayman to Bancredito-DR.  Nor had the Controllers provided any such notice, prior to or as part of the September 4, 2003 Fax Message.  In short, there are no facts to support the claim in Count II that failure to account for or turnover funds in the Bancredito-DR MMA in September of 2003 was a breach of Regions's account agreement with Bancredit Cayman.  Thus, Count II fails as a matter of law.

### F.    The Accounting and Turnover Claims also Fail as a Matter of Law

In Count VIII of the Amended Complaint, Plaintiff seeks an accounting of any monies that may have been wrongfully diverted from Bancredit Cayman into any other accounts or investment vehicles under Defendant's control.  The Court has determined that Defendant is not subject to liability under Article 4A, or under common law breach of contract theories, for any funds that may have been wrongfully transferred.  In particular, the Court has already determined that Defendant had no contractual duty to disclose information about Bancredito-DR's accounts,

as alleged in Count II of the Amended Complaint. As such, there is no legal or equitable basis to require an accounting.

Count X of the Amended Complaint seeks turnover of Plaintiff's funds that Plaintiff alleges are in the possession of the Defendant bank. Even if the Plaintiff had a viable claim against the Defendant arising from the allegedly unauthorized Funds Transfer, the Defendant never had funds in its possession that would have been subject to turnover under 11 U.S.C. §542 or under Florida common law. At best, there were funds of its other customer, Bancredito-DR, in Bancredito-DR's MMA. These funds never belonged to Regions. Thus, the turnover claim is really nothing more than a claim to recover damages from the Defendant for the allegedly unauthorized funds transfer. Since, for the reasons stated earlier, Plaintiff cannot establish liability under any of its theories, there are obviously no damages that may be recovered.

### G.    Plaintiff is Barred from Attacking the Funds Transfer Since it was Ratified by Bancredit Cayman

As an independent alternative basis for granting summary judgment, the Court finds persuasive Defendant's argument that even if Article 4A does not preclude recovery for the disputed transactions, Plaintiff subsequently ratified the allegedly unauthorized transactions by reporting them as authorized for years before bringing the instant action.

An unauthorized wire transfer may be ratified. *Pavlovich v. National City Bank*, 435 F.3d 560 (6th Cir. 2006). In that case, a third party investment advisor directed the defendant bank to transfer funds from the plaintiff's bank account to a pharmaceutical company's account. The company then filed for bankruptcy and the plaintiff sued the bank for breach of contract and under Ohio's adoption of the Uniform Commercial Code for unauthorized wire transfers. The court held that "under Ohio's agency law a principal may ratify the conduct of her agent even if

that conduct was initially unauthorized so that the conduct becomes binding on the principal. [Plaintiff] ratified [agent]'s authority to direct her investments because of her actual knowledge of the transactions coupled with her acceptance of their benefits and her failure to repudiate within a reasonable period of time." *Pavlovich*, 435 F.3d at 568-9 (internal citations omitted).

The Defendant did not cite to any ratification cases under Article 4A, but did cite to persuasive authority applying ratification to alleged Article 3 violations. Specifically, courts have held that a bank may be exonerated from liability when a plaintiff ratifies the alleged unauthorized negotiation of checks. *See Fulks v. Florida Commercial Banks, Inc*., 371 So.2d 521 (Fla. 3d DCA 1979). While that case relied on Florida Statutes, § 673.3-404 (1977), which specifically addresses the issue of ratification and negotiable instruments, the Court sees no reason why these principles of agency should not equally apply to Article 4A funds transfers.

The Restatement of Agency 3d, § 4.01(1) (2006) states that "ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Regions argues that even if Baldera's actions were done without authority, management for Bancredit Cayman subsequently ratified his actions by " (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents." Rest. 3d Agency § 4.01(2).

In support of this contention, Regions offers statements from the Joint Official Liquidators' own reports:

- "***According to management***, it [the CD] was cancelled to settle outstanding inter-company loans and the proceeds were used by Bancredito[-DR] prior to the appointment of Controllers in order to comply with cash commitments to its customers." July 31, 2004 Report, paragraph 5.1.2 (emphasis added); and

- "[T]he Liquidators are satisfied that the Union Planters certificates of deposit

> were transferred to Bancredito[-DR] to set against monies owed to Bancredito[-DR] by the Company [Bancredit Cayman]" May 30, 2006 Status Report, paragraph 4.3.

Exhibits 4 and 8 to Motion for Summary Judgment.  It is clear from these admissions that management for Bancredit Cayman manifested its assent to the transactions as of July 31, 2004, and that the Controllers acted so as to justify a reasonable assumption that they consented to the transactions as of May 30, 2006.

Plaintiff contends that the actions were not ratified, and could not be ratified by the  Joint Official Liquidators because they never expressed a conclusion on the alleged misappropriation and never fully understood the transactions.  Plaintiff argues that evidence of the apparent confusion is the fact that the $13 million Bancredit Cayman CD continued to be included as an asset in quarterly reports which Bancredit Cayman submitted to CIMA.  *See* Fogerty Declaration at #40 *and* Exhibits  N and O to Fogerty Declaration. The contention, even if true, does not change the result.  Whether the Joint Official Liquidators had full knowledge of the transactions when they concluded that the monies were transferred by Bancredit Cayman to Bancredito-DR to offset debts is not determinative. As noted earlier, the rights of the Joint Official Liquidators are no greater than those of Bancredit Cayman.

Thus, to determine whether the transaction was ratified, we need look no further than the admission of Bancredit Cayman's own management reflected in the July 31, 2004 report: "***According to management***, it [the CD] was cancelled to settle outstanding inter-company loans and the proceeds were used by Bancredito[-DR] prior to the appointment of Controllers in order to comply with cash commitments to its customers." (emphasis added).  Report of the Joint Official Liquidators, July 31, 2004. Exhibit 4 to Motion for Summary Judgment.  Based on

Plaintiff's admission, the undisputed fact is that Bancredit Cayman's management authorized the transfer of the proceeds from the $13 million Bancredit Cayman CD to the Bancredito-DR MMA. At oral argument, Plaintiff's counsel offered no evidence on the record to contest this authorization, instead suggesting that management may have been mistaken. The Court finds this suggestion or theory insufficient to rebut Defendant's proof and create a genuine issue of fact regarding ratification.

In short, the fact that Baldera was not an authorized signatory of the Bancredit Cayman Checking Account cannot support a cause of action against the Defendant since the transfer of the funds at issue, done at the direction of Baldera, was in fact, authorized and ratified by Bancredit Cayman management.

### Conclusion

The Joint Official Liquidators for Bancredit Cayman believe that thirteen million dollars was wrongfully diverted from the Plaintiff to Bancredito-DR, its affiliate bank in the Dominican Republic. The ultimate issue in this adversary proceeding is whether the Defendant, Regions, which held the accounts for both banks, should bear the loss because the Defendant transferred the funds on instructions from an individual allegedly not authorized to act on behalf of the Plaintiff.

Despite the length of this Opinion, the Court's decision is really quite simple. The harm to Plaintiff resulted solely from a single funds transfer on December 16, 2002. The rights and liabilities of the parties with respect to that transfer are controlled by Article 4A of the UCC. First, since Plaintiff failed to file suit within one year of learning of the funds transfer, its UCC claim is barred. Second, since the common law counts are not based on actions causing injury to

the Plaintiff independent of the funds transfer, the common law claims are displaced by Article

4A.  Third, even if not displaced, the common law claims fail as a matter of law.  And finally,

the claims all fail because the allegedly unauthorized transfer was ratified by Plaintiff's

management.  Thus, it is -

       **ORDERED** as follows:

       1.      The Motion for Summary Judgment is granted as to all remaining counts of the

Amended Complaint.

       2.      A separate Judgment will be entered in favor of the Defendant and against the

Plaintiff dismissing the Amended Complaint with prejudice.

###

COPIES TO:
See Attached Service List:

<u>**SERVICE LIST**</u>

Timothy T. Brock, Esq.
SATTERLEE, STEPHENS, BURKE & BURKE,  LLP
230 Park Avenue
New York, New York 10169-0079
(Counsel for the Joint Official Liquidators)

Ross R. Hartog, Esq.
MARKOWITZ DAVIS, RINGEL & TRUSTY, P.A.
Two Datran Center, Suite 1225
9130 South Dadeland Boulevard
Miami, Florida 33156-7849
(Co-counsel for the Joint Official Liquidators)

Lisa M. Schiller, Esq.
RICE, PUGATCH, ROBINSON & SCHILLER, P.A.
101 N.E. Third Avenue, Suite 1800
Fort Lauderdale, Florida 33301
(Counsel for Regions)

David S. Garbett, Esq.
GARBETT, STIPHANY, ALLEN & ROZA, P.A.

Brickell By View Centre
80 S.W. Eighth Street, Suite 3100
Miami, Florida 33l30
(Co-counsel for Regions)